IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2024 Session

**STATE OF TENNESSEE v. DENVER CHRISTIAN SMITH**

**Appeal from the Criminal Court for Washington County**
No. 43566      Lisa Nidiffer Rice, Judge

_____

**No. E2023-00182-CCA-R3-CD**

_____

The Defendant, Denver Christian Smith, was convicted by a Washington County Criminal Court jury of first degree felony murder, attempted second degree murder, and attempted carjacking. *See* T.C.A. §§ 39-13-202 (2014) (subsequently amended) (first degree murder), 39-13-210 (2014) (subsequently amended) (second degree murder), 39-13-404 (2018) (carjacking), 39-12-101 (2018) (criminal attempt). On appeal, the Defendant contends that: (1) the trial court erred when it denied the Defendant's motion to suppress his statements to the police and (2) no reasonable trier of fact could find that the Defendant failed to establish his insanity defense by clear and convincing evidence. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Dan R. Smith (on appeal and at trial), Jonesborough, Tennessee, and Nikki Himebaugh (at trial), Johnson City, Tennessee, for the appellant, Denver Christian Smith.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Steven R. Finney, District Attorney General; and Tessa Lunceford and Robin Ray, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions arise from his shooting Chelsea Isbell and Triaria Miller on November 13, 2015. Around 2:00 a.m., the Defendant confronted Ms. Isbell, his father's girlfriend, outside the apartment that she shared with the Defendant and his father. The Defendant believed that Ms. Isbell was an agent in a government conspiracy and had control over the Defendant's father. The Defendant thought he had to escape from his

father and Ms. Isbell in order to inform the federal government of his beliefs. To achieve his plan, the Defendant shot Ms. Isbell multiple times before fleeing from the apartment. She survived the shooting. The Defendant then attempted to stop passing vehicles on John Exum Parkway so he could commandeer a vehicle and leave the area. After several failed attempts, the Defendant shot multiple times at a passing car. One of the bullets fatally struck Ms. Miller, a passenger. Police responded to the shooting scene and arrested the Defendant.

**Motion to Suppress Hearing**

A pretrial hearing was held on the Defendant's motion to suppress his police statements. At the November 13, 2015 hearing, Johnson City Police Department (JCPD) Officer Bret Richardson testified that the Defendant arrived at the hospital around 3:00 a.m. and that he met the Defendant at the hospital at 5:30 a.m. Officer Richardson advised the Defendant of his *Miranda* rights, had him sign a waiver of rights form, and spoke briefly with him. The Defendant was taken to the JCPD station about an hour later after his examination at the hospital. Officer Richardson interviewed the Defendant at the station, and the Defendant verbally confirmed that he understood the rights explained to him at the hospital. The Defendant explained his *Miranda* rights to the officer. Officer Richardson testified that the Defendant said he shot the two victims because of government conspiracies and because computer chips had been implanted in his brain. Officer Richardson stated there appeared to be no rational basis for the Defendant's statements. However, Officer Richardson said that he believed the Defendant gave an effective waiver of his *Miranda* rights because the Defendant had read and signed a waiver form and later verbally confirmed to the officer that the Defendant understood his rights and specifically explained his rights.

Officer Richardson testified that the Defendant admitted to using methamphetamine, "acid," and Suboxone. Officer Richardson stated that the Defendant's admission was consistent with what hospital staff told the officer and that the Defendant's delusions may have been induced by methamphetamine use. On cross-examination, Officer Richardson stated that the Defendant repeatedly said he was very cold, requested blankets, and felt tired. Officer Richardson stated that the Defendant's interview started about five hours after the Defendant was read and waived his *Miranda* rights.

A video recording of the Defendant's interview was received as an exhibit, and portions of it were played for the trial court. In the recording, the Defendant discussed the conspiracy, said he was "cold," and made several incriminating statements. In reference to the shooting of Ms. Isbell, the Defendant stated, "I was aware when I fired that gun that I was gonna shoot her," "I done it because she was gonna blow up the apartment," and "I shot her." When discussing why he shot at Ms. Miller, he said, "I shot at that person because I thought . . . if I can kill them, then I can get that car."

Dr. Thomas Schacht, an expert in forensic psychology, testified that he interviewed the Defendant twice and determined that the Defendant was suffering from acute psychosis on the day of the arrest. Dr. Schacht stated that the Defendant had a long history of mental illness and that the Defendant's intravenous methamphetamine use was a likely source of the Defendant's psychosis. Dr. Schacht testified that his diagnosis of the Defendant was supported by the Defendant's behavior on the day of arrest. Dr. Schacht stated that the Defendant's condition would have been obvious to any normal observer and that the Defendant's psychosis could have made him believe he was "freezing" regardless of the room's temperature.

Dr. Schacht testified that the Defendant was under duress when the police interviewed him because he felt like he was freezing, which is a form of pain. Additionally, Dr. Schacht stated that the police's identifying themselves as government officials when the Defendant stated he was a government informant was "coercive." Dr. Schacht testified that the Defendant's statements at the hospital regarding conspiracies and foreign powers were the product of a mental state in which a person would be unable to maintain rational thought. Dr. Schacht maintained that the Defendant could not understand to whom he was talking on the day of his arrest and could not understand the effect of waiving his *Miranda* rights.

On cross-examination, Dr. Schacht acknowledged that the hospital's mental health evaluator did not recommend psychiatric commitment for the Defendant on the night of the arrest. Dr. Schacht acknowledged that five hours passed between the time Officer Richardson spoke to the Defendant at the hospital and when Officer Richardson spoke to the Defendant at the police station and that the Defendant was able to remember that Officer Richardson was the officer to whom the Defendant spoke at the hospital. Dr. Schacht testified that the Defendant recited most of his *Miranda* rights to the officer at the station.

Dr. Schacht testified that the Defendant was not psychotic when Dr. Schacht interviewed the Defendant five years after the shooting. Dr. Schacht admitted that the Defendant's conversation with Officer Richardson indicated that the Defendant knew he did not have to talk to the police. However, Dr. Schacht said that the Defendant's agreeing to talk to the police could not be understood by the Defendant's words alone without considering how the Defendant's delusions impacted his conception of reality. Dr. Schacht stated that the Defendant was diagnosed with "malingering" when he was evaluated for his competency to stand trial. Dr. Schacht explained that malingering meant that the Defendant tended to exaggerate symptoms. Dr. Schacht testified that he did not evaluate the Defendant for symptoms of malingering when he interviewed the Defendant. Dr. Schacht said that the Defendant had a history of drug-induced psychosis.

The trial court applied the "totality of the circumstances" test to evaluate the Defendant's motion to suppress. The court credited Dr. Schacht's testimony that the

Defendant was suffering from delusions when he gave his statements to the police. The court found that at the time of the interview, the Defendant was age twenty-two, that he had experience with the criminal justice system, and that he could communicate effectively. The court found that the officers did not coerce the Defendant and that the Defendant's will was not overborne. The court credited Officer Richardson's testimony that he read the *Miranda* rights to the Defendant and found that the Defendant signed a rights waiver form at the hospital. The court found that the Defendant was under the influence of methamphetamine at the time of the interview.

The trial court determined that the Defendant's voluntary ingestion of drugs did not render his statements involuntary and that the evidence demonstrated that the Defendant was able to give an events narrative. The court determined that the police did not exploit the Defendant's mental state and that the Defendant's "eagerness" to talk to the police was not due to police misconduct. Accordingly, the court denied the Defendant's suppression motion.

**Trial Evidence**

At trial, a transcript of Chelsea Isbell's sworn testimony was read into the record. Ms. Isbell said that she moved into the Defendant's father's apartment in 2015. She stated that the Defendant acquired a gun three weeks before the shooting and that the Defendant confronted her about her taking things from his backpack. She stated that, during the argument, she put her finger in the Defendant's face and that the Defendant then shot her twice. Ms. Isbell said that she and the Defendant had used methamphetamine regularly. She acknowledged that the Defendant had since apologized to her for the shooting.

On cross-examination, Ms. Isbell said that the Defendant did not say anything to her when she put her finger in his face, that he seemed scared, and that they were close enough that she almost touched his face. She stated the shooting happened around 2:00 a.m.

Chelsey Scott testified that she was driving on John Exum Parkway with Triaria Miller as her passenger. Ms. Scott stated that she saw a man standing in the road, pointing an object at several cars in front of them. Ms. Scott said that she attempted to drive around the Defendant and that he shot two or three times at her car. Ms. Scott stated that Ms. Miller was struck by one of the bullets and that Ms. Scott immediately drove to the hospital. On cross-examination, Ms. Scott testified that the Defendant yelled "no" before he shot at them.

JCPD Officer Mike Mcintosh testified that he drove to the location of the parkway shooting and saw the Defendant in the middle of the road. Officer Mcintosh said that the Defendant threw a handgun to the ground as the officer stopped his police car. Officer Mcintosh said that the Defendant told him that the Defendant had been shot, but the officer

did not find any wounds on the Defendant. On cross-examination, Officer Mcintosh testified that the Defendant peacefully surrendered to police but was incoherent.

JCPD Investigator David Hilton testified that he went to the apartment near John Exum Parkway. Investigator Hilton recovered ammunition inside the apartment that matched the Defendant's handgun's caliber and recovered bullet fragments outside the apartment.

JCPD Officer Bret Richardson testified that he was an investigator assigned to the case. Officer Richardson stated that the Defendant signed a *Miranda* waiver form at the hospital, restated the *Miranda* rights to Officer Richardson at the police station, and appeared to understand the implications of waiving his rights. Officer Richardson testified that, in his experience, it was not uncommon for methamphetamine users to experience delusions or hallucinations. Officer Richardson stated that the Defendant was released from the hospital around 5:00 a.m. Officer Richardson acknowledged that the Defendant tested positive for methamphetamine at the hospital. Officer Richardson said that the Defendant told him that the Defendant had to "shoot the girls to get away" and that he was "aware when I fired that gun that I was going to shoot[.]"

On cross-examination, Officer Richardson testified that he was dispatched to the shooting at about 3:00 a.m., met the Defendant at the hospital around 5:40 a.m., and interviewed the Defendant at the police station several hours later. Officer Richardson maintained he did not notice that the Defendant was impaired. He stated that he did not know whether the Defendant was still feeling the effects of methamphetamine at the interview.

Dr. Joe Mount, a psychologist at Middle Tennessee Mental Health Institute (MTMHI), testified for the defense. Dr. Mount testified that he was on the medical team, which consisted of psychologists, social workers, and medical workers that conducted a court-ordered mental evaluation of the Defendant. Dr. Mount stated that the evaluation consisted of interviews, a treatment plan, a competency evaluation, and the supervision of a psychologist. He said that the Defendant was evaluated at MTMHI from February 17 to March 16, 2016.

Dr. Mount testified that the medical team reached a consensus about the tests to be administered to the Defendant and that the Defendant was evaluated to determine his competency to stand trial, his mental condition at the time of the offenses, and his diminished capacity. Dr. Mount said that he determined that the Defendant was competent to stand trial and that the Defendant was diagnosed with an unspecified psychotic disorder and drug diagnoses for opiates, methamphetamine, alcohol, cannabis, cocaine, and methoxamine use. Dr. Mount said the team determined that clear and convincing evidence supported an insanity defense for the Defendant's actions. Dr. Mount stated that the Defendant wrote multiple letters to the medical team describing his delusions and that the

letters were considered in diagnosing the Defendant. Dr. Mount read several of the letters into the record, which included statements that Ms. Isbell was a North Korean spy, that the Defendant's mind was being controlled, and that the Defendant received secret orders through telepathy. Dr. Mount maintained that the Defendant's drug use did not impact the Defendant's competency evaluation but that drugs impacted the Defendant's insanity evaluation. Dr. Mount affirmed that the Defendant was competent to stand trial and that there was clear and convincing evidence to support an insanity defense.

On cross-examination, Dr. Mount testified that the Defendant inquired about the possibility of an insanity defense before the Defendant gave the medical team the letters describing his delusions. Dr. Mount stated that the Defendant's medical records indicated that the Defendant exaggerated symptoms to receive medication. He acknowledged that the Defendant had received treatment for drug use in the past. He stated that the Defendant's medical records showed that the Defendant prematurely left a detoxification center. He said that the Defendant admitted to using methoxamine, and methamphetamine daily, including on the day of the crimes, and that his drug use became worse in the year before the shootings. Dr. Mount said the Defendant admitted that it was wrong for him to kill Ms. Miller.

The Defendant said that he had "delusions" since age six. He believed that someone was communicating with him telepathically. He maintained that he had delusions before he began using illegal substances. The Defendant elaborated on his delusions of government conspiracies, mind control, and cloning. He said that he admitted himself to Woodridge, a mental health facility, multiple times. He stated that he did not request an insanity defense and that he believed that he was not crazy. He said he had been using drugs in the days before the shootings. He stated that he had not used drugs in prison before his examination by Dr. Mount. The Defendant acknowledged that he had been convicted of theft before the shootings.

On cross-examination, the Defendant testified that he was not taking his prescription medications currently and did not take his prescriptions before the shootings. He said he started using drugs when he was ten years old. He admitted to using several illegal substances and acknowledged that before he had his evaluation by Dr. Mount, he had never made a statement at a mental health facility about having delusions as a child because he did not understand what they were. On cross-examination, the Defendant admitted that he had lied to medical professionals about his delusions to avoid being admitted to a mental health hospital.

After the Defendant's testimony, Dr. Mount was recalled as a defense witness. He testified that he evaluated the Defendant about five months after the shooting. He stated that the Defendant's symptoms did not appear to be drug-induced at the time of the evaluation. Dr. Mount explained that his evaluation of the Defendant's psychosis being the result of a mental disorder rather than drug use was because, at the time of the

- 6 -

evaluation, the Defendant had not been using drugs. Dr. Mount explained that he attributed the Defendant's malingering to his wanting to convince medical staff that his delusions were real. Dr. Mount stated psychosis meant that a person will maintain a consistent belief regardless of the contravening evidence presented to them.

On cross-examination, Dr. Mount admitted that drugs could induce psychosis and that a person could experience delusions like the Defendant had by taking drugs. Dr. Mount acknowledged that drug-induced psychosis could persist after drugs have left someone's system. He stated that if someone developed drug-induced psychosis, the psychosis was unlikely to go away without treatment.

# I
## Motion to Suppress

The Defendant contends that the trial court erred by denying his motion to suppress his confession to the police. The Defendant argues that the court misapplied the voluntariness analysis articulated in *Colorado v. Connelly* to analyze whether the Defendant knowingly and intelligently waived his *Miranda* rights. *See* 479 U.S. 157, (1986). The Defendant has not raised an issue regarding the voluntariness of his confession to police. The State responds that the trial court properly accounted for the totality of the circumstances when it denied the Defendant's motion to suppress. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. Art. I, § 9. To protect an individual's right against self-incrimination, law enforcement must warn

an accused individual before questioning in a custodial interrogation "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). An accused individual may waive the individual's *Miranda* rights if "the waiver is made voluntarily, knowingly, and intelligently." *Id.* at 445. To determine if an accused individual's waiver is valid, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *State v. McKinney*, 669 S.W.3d 753 (Tenn. 2023) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

In determining whether a confession is voluntary, a trial court examines the totality of the circumstances, which encompasses "both the characteristics of the accused and the details of the interrogation." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). The totality of the circumstances test for determining the validity of a *Miranda* waiver is distinct from determining whether a confession is voluntary. *McKinney*, 669 S.W.3d at 765. Relevant circumstances include the following:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)).

A defendant's intellectual disability is among the factors to be considered in a trial court's evaluation of the totality of the circumstances. *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000). "As one court has said, 'no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving [. . .] the constitutional rights embraced in the *Miranda* rubric.'" *Id.* (quoting *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)).

The trial court found that the Defendant signed a *Miranda* rights waiver at the hospital before he was interviewed at the police station. Once the Defendant was at the police station, he gave an interpretation of his rights to Officer Richardson. After

reviewing the interview recording, the court found that at the start of the interview, the Defendant appeared to be relaxed, that he made repeated comments about being cold, and that he requested a blanket. The court noted that although the Defendant made verbal remarks about being cold, he never displayed any physical indications that he was cold or attempted to warm himself. The court found that during the interview, the Defendant "talk[ed] in an almost nonstop fashion[,]" about the circumstances of the shootings, and about a government conspiracy. The court found that the Defendant mentioned that he was incarcerated previously, that he was age twenty-two, and that he had some educational and job experience. The court found that the Defendant's interview occurred hours after his arrest, that the Defendant was in the interview room for two hours, and that the interview only lasted about forty-five minutes. The court acknowledged that no evidence indicated the Defendant was deprived of food, sleep, or medical attention, nor was he threatened. The court acknowledged that Dr. Schacht's testimony correctly surmised that the Defendant was operating in a "mentally challenged state" during the interview. The court accredited the video recording evidence of the Defendant's lack of apparent discomfort over Dr. Schacht's testimony that the Defendant's feeling cold was a form of coercive pain. Additionally, the court did not accredit Dr. Schacht's testimony that the Defendant could not make a knowing and intelligent waiver of his rights when the court found that the evidence demonstrated the Defendant restated his *Miranda* rights from memory and made statements that his cooperation with police could send him to jail.

The record does not preponderate against the trial court's findings at the suppression hearing. The application of the law to the trial court's findings of facts is reviewed *de novo* by this court. In considering the factors articulated by the Tennessee Supreme Court in evaluating the totality of the circumstances of whether the Defendant's *Miranda* waiver was voluntarily given, the evidence reflects that the Defendant was not coerced into waiving his rights. *See Huddleston*, 924 S.W.2d at 671. The Defendant was in his twenties, had previous criminal charges for which he was incarcerated, and had some education. The interview lasted approximately forty-five minutes. The total time the Defendant was in the interview room was about two hours. The Defendant had been in custody for around five hours at the time of his interview.

Officer Richardson did not read the Defendant his *Miranda* rights again in the interview room, but the Defendant acknowledged that he had waived his rights earlier and repeated his rights to Officer Richardson. Although the trial judge found that the Defendant was under the influence of methamphetamine at the time of the interview due to his stating he had taken methamphetamine and his active delusions, Officer Richardson testified that the Defendant was not impaired at the time of the interview. No evidence indicates that the Defendant was abused or threatened by the police.

The recording of the Defendant's interview showed that the Defendant made statements that he was cold but that the Defendant made no attempts to warm himself or shiver. In the recording, the Defendant appeared relaxed and spent the majority of the

interrogation talking to Officer Richardson without being prompted. The Defendant made multiple statements during the interrogation that the shootings and his statements about the shootings could send him to jail. The evidence did not support a conclusion that the Defendant's delusions and prior drug use impacted his ability to restate factual details about the shootings and his *Miranda* rights. The Defendant appeared to appreciate the seriousness of his actions.

In considering the record as a whole, the evidence supports the conclusion that the Defendant voluntarily waived his rights and appreciated the nature or consequences of his *Miranda* waiver. The Defendant signed a *Miranda* waiver and restated his rights to police. The Defendant told police details of the shootings and of his beliefs. The Defendant's beliefs, while spanning many different and illogical topics, did not pertain to the Defendant's understanding of his rights and did not appear to affect the Defendant's ability to recall and recite his rights to Officer Richardson. The Defendant was able to describe in detail his actions pertaining to the shootings. The evidence does not preponderate against the trial court's finding of facts, and the court's findings support its determination that the Defendant intelligently, knowingly, and voluntarily waived his *Miranda* rights. The Defendant is not entitled to relief on this basis.

## II
## Insanity Defense

The Defendant contends that no rational trier of fact could have reasonably rejected his insanity defense because evidence that his psychosis was drug-induced could not rebut the clear and convincing evidence from expert testimony that his insanity was an independent mental health disorder. The State contends the jury found that the expert testimony showing the Defendant's psychosis was caused by his contemporaneous drug use was more compelling than the testimony that showed the Defendant's psychosis was not solely attributable to drug use. We agree with the State.

Tennessee Code Annotated section 39-11-501 states that:

(a) [Insanity] is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

- 10 -

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

The standard for reviewing a jury's rejection of an insanity defense is the reasonableness standard. *State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002). A jury verdict that rejects an insanity defense is reversible only "if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." *Id*. "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id*. at 551 (quoting *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999)). The State has no obligation to "rebut defense proof of insanity with substantial evidence," and "[t]he statute places the burden of establishing this affirmative defense squarely on the defendant." *Flake*, 88 S.W.3d at 554; *see* T.C.A. § 39-11-501(c) (2014). The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

In the light most favorable to the State, the record reflects that the jury heard the Defendant's statements, which indicated that the Defendant appreciated the nature and wrongfulness of his shooting the victims. In his interview, the Defendant said that he "shot at that person because I thought . . . if I can kill them, then I can get that car," that he had to "shoot the girls to get away," and that he was "aware when I fired that gun that I was going to shoot [Ms. Isbell.]" Dr. Mount testified that based on his evaluation of the Defendant at MTMHI, he found sufficient evidence upon which the Defendant could base a defense of insanity. Dr. Mount testified that the Defendant's psychosis was not drug-induced because, by the time he interviewed the Defendant at MTMHI, the Defendant had not used drugs for several months yet was still psychotic. Dr. Mount stated that if psychosis persisted after drugs were out of someone's system, psychosis was likely to have contributed to the Defendant's actions because it was caused by an underlying mental health disorder.

Dr. Mount testified on cross-examination that the Defendant's interview records reflected the Defendant's acknowledgment that it was wrong to kill one of the victims. The medical files introduced into evidence stated that the Defendant tested positive for methamphetamine the day of the shooting and that hospital staff believed the Defendant's delusions were caused by drug use. Dr. Mount testified that he concluded the Defendant had an underlying mental disorder that caused the Defendant's psychosis but acknowledged that methamphetamine use could cause psychosis and that the psychotic

- 11 -

effect of methamphetamine use could last long after the drugs had dissipated from a person's body.

The jury reasonably rejected the Defendant's insanity defense. The evidence presented at trial provided competing theories for the cause of the Defendant's psychosis. A reasonable jury could have credited the evidence of the Defendant's drug-use history over that of Dr. Mount's testimony. Tennessee Code Annotated section 39-11-501(b) states that insanity cannot be based on "criminal" or other "anti-social" behavior. A reasonable jury could have found that the Defendant's drug use was the underlying cause of his psychosis and rejected Dr. Mount's assessment of the Defendant. The evidence of the Defendant's drug use could reasonably create "substantial doubt" in the Defendant's claim that his psychosis was caused by an underlying mental health disorder. *See Flake*, 88 S.W.3d at 554. Additionally, Dr. Mount's testimony is not dispositive in determining whether the Defendant was insane at the time of the commission of his convictions and that such a determination is "a matter for the trier of fact alone." *See* T.C.A 39-11-501(c). Accordingly, the Defendant's claim that the jury unreasonably rejected "clear and convincing evidence" of his insanity defense fails because the competing evidence introduced at trial could have raised, in the jury's mind, substantial doubt about the validity of the Defendant's insanity defense. This court will not "reweigh the evidence or reassess credibility determinations. These tasks are within the province of the jury." *Flake* 88 S.W.3d at 556. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE